**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | | |
|---|---|---|
| **CYNTHIA COOK** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| vs. | ) | |
| | ) | **Civil Action No. _____** |
| **URAC** | ) | |
| | ) | |
| Serve: | ) | |
| Peggy Reed | ) | |
| 1220 L Street, NW, #400 | ) | |
| Washington, DC 20005 | ) | |
| | ) | |
| **Defendant**. | ) | |

**COMPLAINT AND JURY DEMAND**

**Preliminary Statement**

1.      This is a civil action against Defendant URAC for equitable and monetary relief

for injuries that Plaintiff Cynthia Cook sustained as a result of URAC's improper termination of

her employment, in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29

U.S.C. § 2601 *et seq.*; the District of Columbia Family and Medical Leave Act ("DCFMLA"),

D.C. Code Ann. § 32-501 *et seq.*; the Americans With Disabilities Act ("ADA"), 42 USC §

12101 *et seq.*; and the District of Columbia Human Rights Act "(DCHRA"), D.C. Code Ann. §

2-1401.01 *et seq*. Ms. Cook took job-protected leave to care for her husband, who was dying of

terminal cancer, and following his death, to care for her own serious medical condition.  Upon

her return from leave, URAC forced Ms. Cook to choose between a demotion with a 23% cut in

base salary, or the termination of her employment.

1

**Parties**

2.       The Plaintiff, Cynthia Cook, is a resident of the State of New Jersey.

3.       The Defendant, URAC, is a District of Columbia non-profit corporation

headquartered in the District of Columbia. URAC provides national accreditation services to the

managed health care industry.  In calendar year 2013, URAC had 102 employees.  Defendant's

registered agent is Peggy Reed, 1220 L Street, NW #400, Washington, DC 20005.

**Jurisdiction and Venue**

4.       This Court has original jurisdiction over the federal statutory claims in this matter

pursuant to 28 U.S.C. § 1331, and supplemental Jurisdiction over the state claims pursuant to 28

U.S.C. § 1367.

5.       Venue lies in this Court as the Defendant URAC is located in the District of

Columbia, and the controversy involves the Defendant's conduct in the District of Columbia.

6.       Accordingly, both venue and jurisdiction are appropriate and proper in this Court.

**Administrative Exhaustion**

7.       On January 22, 2015, within 300 days of the termination of her employment, Ms.

Cook filed a timely charge of discrimination and retaliation with the D.C. Office of Human

Rights (DCOHR) and cross-filed the same timely charge with the United States Equal

Employment Opportunity Commission.

8.       Ms. Cook withdrew the administrative charge from DCOHR and the EEOC on

September 21, 2015.

**Factual Background**

9.       Ms. Cook joined URAC in January 2007 as a Senior Account Manager. In

February 2008, URAC promoted Ms. Cook to Senior Sales Executive. In June 2010, URAC

promoted her again to Senior Director, Business Development and Sales.

10.     During the relevant time period, Ms. Cook worked remotely from her home in New Jersey. She traveled to URAC's Washington, D.C. office approximately once per month for meetings.

11.     Ms. Cook was a productive employee with a strong track record of success at URAC. Ms. Cook received glowing performance evaluations from several different supervisors throughout her time as a URAC employee.

12.     Ms. Cook's husband was diagnosed with terminal cancer in February 2013.

13.     In November 2013, Ms. Cook first began taking intermittent leave under the FMLA and DCFMLA, and other company leave, after her husband's cancer progressed to Stage IV metastatic cancer.

14.     When Ms. Cook started working for URAC, she reported to URAC Chief Operating Officer William Vandervennet. In June 2013, she began reporting to URAC's new Vice President of Marketing and Sales, Robert Trachman.

15.     Mr. Trachman rated Ms. Cook's job performance during the 2013 calendar year as "exceeding expectations." She met her individual goals, and her team exceeded $4.3 million in new cash sales.

16.     URAC's Marketing and Sales Department was composed of the Business Development and Sales group, led by Ms. Cook, and the Accounts Management group, led by Director of Accounts Management Michelle Phipps.

17.     In April 2014, Mr. Vandervennet instructed Mr. Trachman and Ms. Phipps to create an action plan to increase revenue in Account Management because its Q1 2014 revenue fell below target. Account Management's revenue typically fell below target in the first quarter

of every year because clients did not prioritize spending on accreditation services, instead reserving spending on those services until later in the fiscal year.

18.     URAC terminated Mr. Trachman's and Ms. Phipps' employment soon after they submitted their action plan to Mr. Vandervennet. On April 11, 2014, Mr. Vandervennet informed Ms. Cook that he terminated Mr. Trachman's employment because he was not confident that the action plan would remedy Account Management's revenue shortfall. During this conversation, Mr. Vandervennet stated to Ms. Cook: "keep doing what you've been doing" in managing the Business Development and Sales side of the Sales and Marketing Department. Mr. Vandervennet expressed no criticism of Ms. Cook's performance or the overall performance of Ms. Cook's Business Development and Sales group.

19.     By the end of Q2 2014, Account Management's revenue was ahead of budget.

20.     By April 2014, Ms. Cook's husband's physical condition continued to deteriorate. As a result, in April and May 2014, Ms. Cook developed a plan for backup assistance to ensure continuity of sales operations in the event she had to take extended leave to care for her husband.

21.     Ms. Cook submitted her final business continuity plan to Mr. Vandervennet on May 28, 2014. She detailed her current corporate sales initiatives and identified a point person to take responsibility for each of her duties during her absence.

22.     On June 1, 2014, Ms. Cook began taking continuous leave under FMLA and DCFMLA to care for her husband.

23.     On June 2, 2014, Mr. Vandervennet sent an email to URAC leadership congratulating Ms. Cook's team for "significantly beating" its new May monthly sales goal of $402,000. Her team's monthly sales for May totaled $662,000.

24.     URAC CEO Kylanne Green echoed Mr. Vandervennet's praise for Ms. Cook's team's "great accomplishment." She thanked them for their hard work and congratulated the team on their success.

25.     When Ms. Cook went out on leave on June 1, 2014, URAC had given her no indication or notice that it considered her performance less than acceptable.  To the contrary, Mr. Vandervennet complimented Ms. Cook on her performance, both orally and in writing.

26.     Ms. Cook's husband died of cancer on June 17, 2014.

27.     Ms. Cook took bereavement leave from June 18–20, 2014. On June 23, 2014, she told Mr. Vandervennet that she was not ready to return to her full-time duties. He told her to speak with Human Resouces to determine what type of leave to take.

28.     Ms. Cook took sick leave from June 23–July 1, 2014. Vice President of Human Resources Sonya Lee told her that URAC did not expect her to return to work right away following her husband's death.

29.     On July 1, 2014, Ms. Cook spoke with Human Resources Specialist Dana Hill. Ms. Hill informed Ms. Cook that after her husband's death, she could no longer take FMLA/DCFMLA job-protected leave for her husband's medical condition. Ms. Hill told Ms. Cook that she could take personal leave (which provided no job protection) or, if she had her own serious medical condition, FMLA/DCFMLA leave (both of which provided job protection).

30.     On July 1, 2014, Ms. Hill sent Ms. Cook paperwork that expressly stated that Ms. Cook was eligible to take job-protected leave under both the FMLA and DCFMLA (attached hereto as Exhibit 1).

31.     In reliance on URAC's representation that she was eligible for FMLA and DCFMLA leave, Ms. Cook took disability leave starting on July 2, 2014.  Had URAC not

represented that Ms. Cook was eligible for FMLA and DCFMLA leave, she would have explored

other options to keep her job, such as requesting reasonable accommodation.

32.     During her leave from July 2, 2014 to September 15, 2014, Ms. Cook suffered

from physical and mental impairments that substantially limited her ability to sleep, concentrate,

think, and work.

33.     During her leave from July 2, 2014 to September 15, 2014, Ms. Cook received

continuing treatment from her health care providers.

34.     On August 12, 2014, while she was out on leave, Ms. Cook underwent elective

arthroscopic knee surgery to repair a torn meniscus in her right knee, which had not responded to

a conservative physical therapy treatment plan.

35.     Ms. Cook scheduled the elective surgery because URAC had represented to her

that she was eligible for leave under FMLA and DCFMLA.

36.     Throughout July and August 2014, Ms. Cook provided ongoing updates to

Human Resources and informed URAC of her intent to return to work in September 2014. As

she was making positive progress in both physical therapy and mental health sessions, she

notified URAC on August 26, 2014 that she would return to work on September 15, 2014 after

taking only ten weeks of leave.

37.     In July 2014, while Ms. Cook was out on leave, URAC hired Christian Moritz to

serve as URAC's new Vice President of Sales & Marketing.

38.      On September 16, 2014 Ms. Cook welcomed Mr. Moritz to URAC and

expressed that she looked forward to working with him. Mr. Moritz asked her opinion about how

URAC differs from its competition, about URAC's strengths, and about any challenges that the

organization faces.

39.     Also on September 16, 2014, Ms. Cook resumed her weekly sales meetings with her team. Her team was ahead of its plan, with only an additional $500,000 in revenue needed to meet the 2014 target of $4.1 million. She congratulated the team on their work. Mr. Moritz interjected to say that, although cash was promising, there was concern that over fifty percent of the cash came from one product: Specialty Pharmacy. This contrasted with Mr. Trachman's emphasis during budget meetings earlier in the year that the focus was to be on bringing in cash, regardless of the product, and to "get them away from product focus." Ms. Cook told Mr. Moritz that she had raised the same concern about the overreliance on Specialty Pharmacy in earlier reports, and that she had questioned URAC's lack of marketing campaigns to promote their new products.

40.     On September 19, 2014, Ms. Cook met with Mr. Moritz in person for the first time in his Washington, D.C. office. She told him she was happy to be back at work. URAC CEO Kylanne Green then joined the meeting with Mr. Moritz and Ms. Cook.

41.     Mr. Moritz informed Ms. Cook that URAC felt it was important to have a Director of Business Development and Sales who reported daily into the Washington, D.C. office. Neither Ms. Green nor Mr. Moritz asked Ms. Cook if she would be willing to relocate to Washington D.C.

42.     Mr. Moritz then presented Ms. Cook with two options: (1) a demotion to a Sales Executive II position with the corresponding base salary of $112,000 (a $35,000 reduction from her then-current base salary) and a yet-to-be-determined commission structure, or (2) termination of her employment with an already-prepared severance package.

43.     On September 19, 2014, URAC notified Ms. Cook that effective October 1, 2014, she would be demoted to the Sales Executive II position, and her annualized base salary reduced to $112,000.

44.     Mr. Moritz handed Ms. Cook an envelope containing a letter from him summarizing their meeting and her two options, a memo from the Vice President of Human Resources outlining her new salary (but not her commission structure) if she chose to accept the demotion, a copy of URAC's severance policies and procedures, and a copy of her mid-year 2014 review completed by Mr. Vandervennet on September 16, 2014—just three days earlier.

45.     Mr. Vandervennet's mid-year 2014 review of Ms. Cook's performance was the worst of her career. The review purportedly covered Ms. Cook's  performance from January 1, 2014 to June 1, 2014. However, during that time, Ms. Cook had been on intermittent FMLA/DCMFLA leave caring for her husband. In order to continue managing the sales team and meeting their financial goals while she was on intermittent leave, she gave her own sales leads to her team so that her leave did not negatively impact the organization.

46.     The language of the review stood in stark contrast to the laudatory remarks Mr. Vandervennet made just after the end of her review period, on June 2, 2014, when he emailed URAC leadership to congratulate Ms. Cook's team for "significantly beating" its new May 2014 monthly sales goal.

47.     The review stated that Ms. Cook would be demoted to a Sales Executive II position. URAC demoted Ms. Cook on the basis of one mid-year review covering the period when Ms. Cook was taking leave to care for her dying husband, and notwithstanding her eight years record of above-average reviews at URAC, including her annual review in December 2013.

48.     URAC never gave Ms. Cook the opportunity to improve the purported deficiencies in her performance.

49.     At a managers meeting on September 24, 2014, Mr. Vandervennet reported that URAC had favorable YTD revenue, was ahead of plan, and was having a very positive year, with success in both sales and account management. He stated that URAC senior management expected the sales results to meet or exceed the plan and thanked them for their great performance.

50.     For the 2014 calendar year, Ms. Cook was on track to lead her team to achieve $3.6 million in new cash sales. As of September 30, 2014, her team had closed $3,245,661 in sales.

51.     Ms. Cook was also on track to meet her objective of producing through personal production new cash sales of $500,000. As of September 30, 2014, she had closed $348,150 in new cash sales, and she would have met her target had she been allowed to return to work in her former position. She gave two new sales to one of the sales executives to close while she was on leave.

52.     Because Q4 was historically the busiest time of the year for closing sales, there was little doubt that Ms. Cook and her team would achieve the overall individual and team combined target of $4.1 million.

53.     Following the September 19, 2014 meeting in which URAC told her to choose between termination and demotion, Ms. Cook pressed Mr. Moritz for details about the commission structure of the Sales Executive II demotion. Ms. Cook asked Mr. Moritz what her sales quota would be, and whether she would be assigned to a certain sales territory. The commission structure and sales territory would determine how significant a cut Ms. Cook would

have to take in total compensation. Mr. Moritz did not answer her questions, and told Ms. Cook

that her performance expectations, and the commission structure, would be explained to her only

after she accepted the Sales Executive II position.

54.     Based on the negative review and Mr. Moritz's refusal to provide more

information, Ms. Cook believed that if she accepted the Sales Executive II position, URAC could

set impossible sales goals for her and terminate her for failing to meet those goals. She also

believed URAC could assign her a territory and set commission rates so that she could not earn

anywhere near the compensation she had before her FMLA/DCFMLA leave.

55.     Because of the lower base salary and her belief that commissions would not make

up the difference, and that she would ultimately be fired, Ms. Cook refused the demotion.

URAC terminated Ms. Cook's employment, effective September 30, 2015.

56.     URAC similarly discriminated against another employee who took FMLA leave

in 2014. That employee had recently been recommended for a promotion, but when she

announced her pregnancy to URAC management, URAC began to marginalize and demote her

in an effort to force her resignation. URAC then violated its own policies in denying the

employee's request for sick leave in order to extend her maternity leave. Finally, URAC took

away the employee's private office and demoted the employee a second time immediately after

she returned from maternity leave. In that scenario, URAC's head of Human Resources justified

its actions by saying that URAC was changing and that the employee would have to either

"embrace change" or leave. The employee was forced to resign.

## COUNT I

### Interference in Violation of the FMLA

57.     The foregoing paragraphs are incorporated by reference as if fully set out herein.

10

58.     URAC was a covered employer as defined by the FMLA, as it was engaged in an

industry affecting commerce, and it employed fifty or more employees for each working day

during each of twenty or more calendar workweeks in the current or preceding calendar year. 29

U.S.C. § 2611(4).

59.     Plaintiff was covered under the FMLA as an employee with a serious health

condition employed by Defendant for at least twelve months, and who had performed at least

1,250 hours of service during the previous twelve-month period. Id. § 2611(2).

60.     URAC notified Ms. Cook in a July 1, 2014 letter that she was eligible for leave

under the FMLA.

61.     The FMLA prohibits covered employers from interfering with the exercise of an

employee's FMLA rights. 29 U.S.C. § 2615(a) provides that it is "unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the

FMLA.

62.     URAC violated the FMLA when it interfered with Ms. Cook's right to be restored

to her previous position or its equivalent. Four days after she returned to work from FMLA

leave, URAC forced Ms. Cook to accept either a demotion and $35,000 cut in her base salary,

with a yet-to-be-determined commission structure and territory, or the termination of her

employment. 29 U.S.C. § 2614(a)(1)(A)-(B) states that a covered employee is entitled to be

restored to her same position of employment, or to "an equivalent position with equivalent

employment benefits, pay, and other terms and conditions of employment" upon return from

leave.

63.     Employers who violate the FMLA "may be liable for compensation and benefits

lost by reason of the violation, for other actual monetary losses sustained as a direct result of the

violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered." Id. § 825.220(b); 29 U.S.C. § 2617.

64.     Plaintiff has suffered damages as a result of Defendant's unlawful actions.

## COUNT II

### Interference in Violation of the DCFMLA

65.     The foregoing paragraphs are incorporated by reference as if fully set out herein.

66.     URAC was an employer as defined by the DCFMLA because it meets the definition of D.C. Code § 32-501(2): "any individual, firm, association, or corporation . . . who uses the services of another individual for pay in the District."

67.     Ms. Cook was an employee as defined by D.C. Code § 32-501(1) because she was employed by URAC for 1 year without a break in service and worked at least 1000 hours during the 12-month period immediately preceding her request for leave.

68.     URAC notified Ms. Cook in a July 1, 2014 letter that she was eligible for leave under the DCFMLA.

69.     D.C. Code § 32-507(a) prohibits covered employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise any right" under the DCFMLA. D.C. Code § 32-505(d) also states that an employee who exercises her right to leave must be restored to the same position that she held when leave commenced, or restored to a position "equivalent to the position held . . . when the family or medical leave commenced that includes equivalent employment benefits, pay, seniority, and other terms and conditions of employment."

70.     URAC violated the DCFMLA when it interfered with Ms. Cook's right to be restored to her previous position or its equivalent. Four days after she returned to work from

DCFMLA leave, URAC forced Ms. Cook to accept either a demotion and $35,000 cut in her

base salary, with a yet-to-be-determined commission structure, or the termination of her

employment.

71.     Employers who violate the DCFMLA may be liable for wages, salary,

employment benefits, and other compensation denied or lost to the employee due to the

violation, plus interest. *See* D.C. Code § 32-509(b)(6)(A). The employer may also be liable for

consequential damages, which can be no larger than three times the amount paid in wages,

salary, employment benefits, or other compensation denied or lost to the employee. *Id.* at § 32-

509(b)(6)(B).

72.     Plaintiff has suffered damages as a result of Defendant's unlawful actions.

## COUNT III

## Discrimination in Violation of the ADA

73.     The foregoing paragraphs are incorporated by reference as if fully set out herein.

74.     URAC is an employer as defined in 42 U.S.C. § 12111(5)(A) because it was

engaged in an industry affecting commerce and it had 15 or more employees for each working

day in each of 20 or more calendar weeks.

75.     Ms. Cook was an employee as defined in 42 U.S.C. § 12111(4).

76.     Ms. Cook had a disability as set forth in 42 U.S.C. § 12102 in that during her

leave from July 2, 2014  to September 15, 2014, Ms. Cook suffered from physical and mental

impairments that substantially limited her ability to sleep, concentrate, think, and work.

77.     During her leave from July 2, 2014  to September 15, 2014, Ms. Cook received

continuing treatment from her health care providers.

78.     On August 12, 2014, while she was out on leave, Ms. Cook underwent elective arthroscopic knee surgery to repair a torn meniscus in her right knee.

79.     In addition, even if Ms. Cook were found to not have a disability, URAC regarded her as having such an impairment as per 42 U.S.C. § 12102. She informed Ms. Hill from Human Resources that she was under the care of medical providers for significant physical and emotional conditions, and therefore requested and qualified for short-term disability, which entitled her to 13 weeks of paid leave. She also notified Ms. Hill that she was undergoing arthroscopic knee surgery on August 12, 2014.

80.     URAC discriminated against Ms. Cook in violation of the ADA on September 19, 2014 when it refused to return her to the same position she held prior to taking leave.  Four days after she returned to work from disability leave, URAC forced Ms. Cook to accept either a demotion and $35,000 cut in her base salary, with a yet-to-be-determined commission structure, or the termination of her employment.

81.     URAC's actions were intentional, willful, and in reckless disregard of Plaintiff's rights under the ADA.

82.     Plaintiff has suffered damages as a result of Defendant's unlawful actions.

## COUNT IV

### Discrimination in Violation of the DCHRA

83.     The foregoing paragraphs are incorporated by reference as if fully set out herein.

84.     URAC is an employer as defined in D.C. Code § 2-1401.02.

85.     Ms. Cook was an employee as defined in D.C. Code § 2-1401.02.

86.     Ms. Cook had a disability as set forth in D.C. Code § 2-1401.02 in that during her leave from July 2, 2014 to September 15, 2014, Ms. Cook suffered from physical and mental impairments that substantially limited her ability to sleep, concentrate, think, and work.

87.     During her leave from July 2, 2014 to September 15, 2014, Ms. Cook received continuing treatment from her health care providers.

88.     On August 12, 2014, while she was out on leave, Ms. Cook underwent elective arthroscopic knee surgery to repair a torn meniscus in her right knee.

89.     In addition, even if Ms. Cook were found to not have a disability, URAC regarded her as having such an impairment as per D.C. Code § 2-1401.02. She informed Ms. Hill from Human Resources that she was under the care of medical providers for significant physical and emotional conditions, and therefore requested and qualified for short-term disability, which entitled her to 13 weeks of paid leave. She also notified Ms. Hill that she was undergoing arthroscopic knee surgery on August 12, 2014.

90.     URAC discriminated against Ms. Cook in violation of the DCHRA on September 19, 2014 when it refused to return her to the same position she held prior to taking leave. Four days after she returned to work from disability leave, URAC forced Ms. Cook to accept either a demotion and $35,000 cut in her base salary, with a yet-to-be-determined commission structure, or the termination of her employment.

91.     URAC's actions were intentional, willful, and in reckless disregard of Plaintiff's rights under the DCHRA.

92.     Plaintiff has suffered damages as a result of Defendant's unlawful actions.

15

WHEREFORE, the premises considered, Plaintiff Cynthia Cook respectfully requests that this

Honorable Court:

   (a) Enter judgment on her behalf against the Defendant, URAC;

   (b) Award the Plaintiff back pay in an amount to be determined at trial;

   (c) Reinstate Plaintiff to her former position, or in the alternative, award front pay in an

        amount to be determined at trial;

   (d) Award the Plaintiff liquidated damages under the FMLA;

   (e) Award the Plaintiff consequential damages under the DCFMLA

   (f) Award the Plaintiff compensatory and other damages under the DCHRA and ADA in an

        amount to be determined at trial;

   (g) Award the Plaintiff punitive damages under the DCHRA and the ADA in an amount to

        be determined at trial;

   (h) Award the Plaintiff her court costs, expenses, and attorneys' fees

   (i) Award the Plaintiff prejudgment and postjudgment interest;

   (j) Declare that the Defendant's conduct is in violation of the FMLA, the DCFMLA, the

        ADA, and the DCHRA; and

   (k) Grant such other relief as this Court deems just and proper.


## JURY DEMAND

Plaintiff Cynthia Cook demands trial by jury on all issues so triable.

September 25, 2015                Respectfully submitted,

_____

David Wachtel, Esquire (D.C. Bar #
wachtel@bernabeipllc.com
Peter M. Whelan, Esquire (D.C. Bar #
whelan@bernabeipllc.com
BERNABEI & WACHTEL, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
(202) 745-1942 (Tel)
(202) 745-2627 (Fax)

Attorneys for Plaintiff Cynthia Cook